**AYRES, Lost Will of, In re**

Ohio Appeals, 2nd Dist.,
Franklin Co.

No. 3266. Decided Dec. 2nd, 1940.

Carrington T. Marshall, Columbus, Allen I. Pretzman, Columbus, L. D. Agler, Columbus, for appellants.

O. H. Mosier, Columbus, Henry L. Scarlett, Columbus, for appellees.

## OPINION

By BARNES, J.

The above entitled cause is now being determined as an error proceeding by reason of an appeal from the Probate Court of Franklin County. Ohio.

Kate T. Ayres, resident of Columbus, died in January, 1939, at the age of eighty years. She had never been married, had no relatives living in Columbus, and those living outside of Ohio were not closely related. She left a personal estate of considerable value.

Her former home, which she spoke of as her prize possession, sometime in 1917 had been deeded to her church (the Presbyterian denomination) in consideration of her receiving from the church the sum of $50.00 per month so long as she lived.

For some time prior to her death she had hallucinations to the point that she was mentally incompetent. This situation was brought on by a heart condition and had been progressive for a number of years.

Her close friends at first, possibly for three or four or five years prior to her death, on occasions noticed some changes on some subjects in her conversation. All witnesses generally spoke of her as a very fine little lady, with a very keen mind. Even up until a very short time before her death she had times when apparently she was perfectly normal in her conversation and actions.

Some two years prior to her death a guardian had been appointed for Miss Ayres, upon the ground that she was physically unable to take care of herself. The guardian immediately following his appointment employed a nurse in the person of a Miss Chambers who thereafter lived in the home and was in constant attendance on her patient.

Miss Ayres, for a number of years, had a safety deposit box in the Huntington National Bank. The guardian, following his appointment had access to this safety deposit box and found in duly executed form what purported to be a codicil to a will of Miss Ayres. The guardian found no will, and then requested Miss Chambers, the nurse, to make search of Miss Ayres' living quarters to ascertain if any such will could be found. Miss Chambers had this continuously in mind and at no time found any such document. On various occasions she talked with Miss Ayres upon the subject of a last will and testament and learned from Miss Ayres that her last will had been destroyed, which information was communicated to the guardian. Miss Chambers also, on or about November 13th, 1939, gave similar information by letter to counsel for one of the heirs.

Miss Ayres during her lifetime had on different occasions consulted Charles W. Wardlow, a regular practicing lawyer in Columbus, on different matters. Among others was the question of the preparation for her of a last will and testament. The codicil heretofore referred to was prepared by Mr. Wardlow. On December 23, 1937, Mr. Wardlow turned to the guardian of Miss Ayres what is claimed to be a copy of the last will and testament of Miss Ayres. In this purported copy no signatures or copied signatures of either Miss Ayres or witnesses appear. The same is dated December 4, 1928. The principal beneficiaries under this copy were under Item VI, the Board of Foreign Missions of the Presbyterian Church in the United States of America; Item VII, the Board of National Missions of the Presbyterian Church in the United States; and Item VIII, the Chicago Hebrew Mission of Chicago, Illinois.

On January 12, 1940, application was made to probate a lost will of Miss Ayres, and the copy of the instrument turned over by Mr. Wardlow to the guardian was the sole evidence of the contents of the claimed lost will.

An extended hearing was had before the Probate Court in which proponents of the so-called lost will called and interrogated numerous witnesses, followed by cross-examination by counsel representing the administrators or heirs all of whom were objecting to the probating of such claimed lost will. Following the presentation of the testimony, and after due consideration the Probate Court determined that the proponents of the so-called lost will had failed in their proof and declined to admit the instrument to probate.

From this decision the proponents gave notice of appeal, and thereafter perfected their proceed-

ng through which the cause was lodged in our Court as an error proceeding.

Counsel for proponents sets out eleven separately stated and numbered specifications in their assignments of error. All of these separately stated assignments may be encompassed in the single claim that the finding and judgment of the Court was contrary to the evidence and the law.

The law governing the probating of lost wills is found under £10504-35 GC, et seq., which pertinent sections read as follows:

"Sec. 10504-35. LOST, SPOLIATED OR DESTROYED WILLS MAY BE ADMITTED TO PROBATE.— The Probate Court may admit to probate a last will and testament which it is satisfied was executed according to the provisions of law in force at the time of its execution, and not revoked at the death of the testator, when such original will was lost, spoliated or destroyed subsequent to the death of such testator, or after he became incapable of making the will by reason of insanity, or before the death of such testator if testator's lack of knowledge of such loss, spoliation or destruction can be proved by clear and convincing testimony, and it can not be produced in court in as full, ample and complete a manner as the court now admits to probate last wills and testaments, the originals of which are actually produced therein for probate."

"Sec. 10504-38 GC. LOST OR SPOLIATED WILLS MAY BE PROBATED, HOW.—If upon such proof, the court is satisfied that such last will and testament was executed in the mode provided by the law in force at the time of its execution, that its contents are substantially proved, that it was unrevoked at the death of the testator, and has been lost, spoliated or destroyed since his death, or his becoming incapable as aforesaid; or before the death of the testator if his lack of knowledge of such loss, spoliation or destruction can be proved by clear and convincing testimony, such court shall find and establish the contents of such will as near as can be ascertained and cause them and the testimony taken in the case to be recorded in such court."

It will be noted under the last section above quoted that a higher degree of proof than the mere preponderance of evidence is required in order to warrant the court to probate a claimed lost or spoliated will.

The nature of the claimed errors requires a very careful study and analysis of the evidence presented through the bill of exceptions.

This we have endeavored to do. Under the prescribed procedure in the hearing before the Probate Court none but the proponents of the claimed lost will were permitted to call and examine witnesses.

The right was given to the objectors to cross-examine such witnesses, but not to call witnesses of their own. Counsel for the applicants called and interrogated fourteen witnesses. Aside from Mr. Charles W. Wardlow none of these witnesses had ever seen any last will and testament of Miss Ayres. Much of the testimony of these witnesses was directed to the question of the mental lapse of Miss Ayres, it being the evident purpose of such interrogation to place the mental incapacity back as far as possible preceding the death, so as to shorten the time through which a legal renunciation of the claimed will might be presumed. Some of the thirteen witnesses testified as to Miss Ayres having talked in a general way concerning the dispo-

sition of her property. No details were testified to by any witnesses. Evidence was presented of conversations in which Miss Ayres indicated that she did not want her property to go to her relatives; also testimony in the same general way that the matter had been taken care of.

From the very nature of things the major consideration must be given to the testimony of Mr. Charles W. Wardlow. Mr. Wardlow at the time of the hearing was 77 years of age, and had retired from active practice. He had been admitted to practice some fifty years previously. In the last few years of his practice he did not have at his command a competent stenographer. His direct examination would support counsel's claim of execution, publication and authentication of a lost will of which the document presented in evidence was an exact copy. However, in cross-examination, it is conclusively shown that Mr. Wardlow has no independent recollection of the requisites for the execution of the will by Miss Ayres. It is very apparent that his testimony in chief was from deductions, based on his reasoning as to what must have happened. He was unable to call to mind as to where Miss Ayres signed the document, or who the witnesses were. It is manifest that Mr. Wardlow is a man of very high character and very conscientious. He thinks some considerable time was taken by him in making up the pen draft of Miss Ayres' proposed will preparatory to having it typed. When he suggested to Miss Ayres that he would take it to a competent typist to have the work done, she suggested that she take it and write it out in longhand, since he had told her many years previous on the execution of a former will that a document written in her own hand was the strongest and

best will that could be made.

At some time in the future Mr. Wardlow testifies that Miss Ayres inquired, or possibly suggested that she prepare and leave with him a copy of her will for his files or for ready reference if any changes were desired in the future.

He further testifies that the copy introduced in evidence as an exhibit was the one she furnished in her own handwriting, but as heretofore stated, unsigned, and with no witnesses, Mr. Wardlow was unable to call to mind as to when or how the copy was placed in his possession. It may have been handed to him by Miss Ayres or he may have received it through the mail. It may have been near its date of December 4, 1928, or it may have been at the time of the execution of the codicil on December 21, 1931.

The codicil in its first paragraph contains the following:

"Declare this to be a codicil to my last will and testament dated the fourth day of December, One Thousand Nine Hundred and Twenty-Eight."

The codicil is executed in due form. The reference to a will and its date would be supporting evidence that at the time of its execution, to wit, December 21, 1931, Miss Ayres at least thought that she had an executed last will and testament. This inference would probably not go to the extent of raising the requisite presumption of due execution. It was the conclusion of the Probate Court that the evidence was not sufficient to establish the due execution of the claimed lost will. Even if we should hold that the trial court was in error in this pronouncement, there still remains the question as to whether or not the claimed lost will was in existence at such times as

required under §10504-35 GC.

The Supreme Court in the case of **Cole v McClure, et al, 88 Oh St, p. 1,** in the 3rd syllabus, makes the following pronouncement:

"3. Where a will has been lost or destroyed before the death of the testator, the law presumes that he revoked it; and where he became insane after he made the will, the evidence to overcome this presumption must be certain, satisfactory and conclusive that it was unrevoked and in existence after he became 'incapable by reason of insanity to make a will.' "

If it be conceded that the evidence adequately supports the existence of a duly executed will on December 21, 1931, (being the time of the execution of the codicil), there still remains an interim of mental capacity to make a will on the part of Miss █ Ayres for several years following, and hence the presumption exists that Miss Ayres revoked the purported document.

Mr. Wardlow gives no testimony which might offset this presumption except he states that at a date subsequent to the execution of the codicil he stated to Miss Ayres that it was doubtful if he would be able to administer her estate. The copy shows that he was named as administrator, but there was also an alternative provision that if he did not qualify, then The Huntington National Bank should act. Mr. Wardlow testifies that Miss Ayres replied to his observation, "Well, that is all provided for."

This brings us to two questions very earnestly stressed by counsel for applicants, as follows: It is urged that the execution of the codicil, regular in all respects, constituted a republishing of the document which would cure all im-perfections in execution, and further by its terms was so connected with the will that a destruction or attempted revocation of the principal document would not have the effect in law of so doing unless the codicil was also revoked.

We think the law is well defined in Ohio and in many other jurisdictions to the effect that the due execution of a codicil █ by a person competent to execute a will, will have the effect of republishing the last will and testament, which latter document had defects in its execution.

Touching on this question we have examined the following authorities:

Morris v Osborne, et, 27 O. G. A., 161, Syl. 3:

"3. Where a codicil is attached to a will, which clearly and unmistakably refers to the will, so as to preclude all doubt as to its identity, the will and codicil are to be taken and construed together as parts of one and the same instrument, and proof of the codicil will establish the will."

Motion to certify the above-entitled cause to the Supreme Court was overruled April 25, 1916.

Other authorities will merely be cited, not quoted from.

**Clark v Carpenter, 14 Oh Ap 278;**
**Foye v Foye, 35 Oh Ap 283;**
Trull v Patrick, exec., 22 N. P., N. S., 385;
Page on Wills, § 514 (Early edition, §311);
In re Murfield, 74 Iowa 479;
Newton v Seamen's Friends Society, 130 Mass. 91;
Darby v Chantean, 24 Mo., 587;
Stoner v Kendall, 1 Coldw. (Tenn.) 557;
McCurdy v Neall, 42 N. J. Equity, 333;

Skinner v American Bible Society, 92 Wis. 209.

The second and connected question is whether or not a destruction or an attempted revocation of the principal document would have any effect in the absence of a destruction or revocation of the so-called codicil.

We find nothing in Ohio bearing directly on this question. Counsel for plaintiff argue that a codicil is so connected with the will that the destruction or revocation of the original instrument has no effect, unless the codicil is likewise revoked. This reasoning is evolved from cases where lines were drawn through certain parts of the will, or a page or part of a page was torn out, in which cases it was held that unless it was the intention to revoke the entire will, the attempted withdrawal of certain paragraphs or pages would be ineffective. It is reasoned by counsel for plaintiff that since the executed codicil becomes a part of the will and the two together, one instrument, that the principle announced denying right of revocation in part should be given full application in the instant case.

We do not think the rule of law should be given such broad application. After all, a ▮▮▮▮▮▮ ▮ will and codicil are two different instruments, generally separately executed, although, as heretofore stated a duly executed codicil may have the effect of republishing the original will and curing imperfections in its execution.

Counsel for plaintiff apparently concede that the destructon or revocation of the original will might be strong supporting argument as to the revocation of one but not the other, if there is any evidence in the instant case that the claimed lost will had been destroyed or revoked.

We are unable to follow counsel under this claim, since under the law a presumption arises that the lost will was destroyed or revoked by the decedent. As we view it. this presumption, unless overcome, is just as effective as though there was presented direct evidence of such destruction or revocation.

We still have the further question as to whether or not the codicil, which was in duly executed form, should have been ordered probated.

To our minds this presents the most serious question. However, the proponents of the will are in no wise interested under any of the provisions or bequests in the codicil, and this might be suffi··ent reason to determine this question adversely to the plaintiffs.

The codicil contains two. and only two, testamentary provisions:

1. It recites that $100.00 given to a named legatee in the original will is withdrawn and given to another named legatee.

2. That two persons named in the original will who were to make distribution of certain personal effects of the decedent were removed and two others named.

We are referred to the very similar will in the case of In re Francis' Will, 132 N. Y. S., 695, 703. The original will had been revoked but the codicil was not. Both were denied probate because so inter dependent as to be incapable of separate existence. The codicil only provided for the revocation of one legacy made in the will, and named two others to share it. It named another executor and affirmed and republished the will.

We are also referred to the cases of:

Malone's Admr., et v Hobbs et, 1 Rob. (40 Va.), 346-366;

Youse v Forman, 5 Bush, (68 Ky.) 337;

In re Nokes Estate, 130 N. Y. S., 187.

Contra the above, we find very respectable authority that under certain conditions a will and codicil may be so independent of each other that either may stand alone. Vol. 68 Corpus Juris, page 852.

Under the facts in the instant case we find no prejudicial error, and, therefore, the judgment of the Probate Court will be affirmed and costs adjudged against appellants.

Cause remanded for further proceedings according to law.

HORNBECK, PJ., GEIGER, J., concur.